## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

L.B. BENON FAMILY LIMITED
PARTNERSHIP, BENON MARITAL
TRUST, HASSON FAMILY TRUST,
GREENS FAMILY LIMITED
PARTNERSHIP, INDIVIDUALLY AND
ON BEHALF OF MERCANTILE
BUILDING COUNCIL OF CO-OWNERS,

    *Plaintiffs*,

    v.

N.F. MGT., INC., MERCANTILE
MANAGER LLC, TEXAS NAME
LIMITED, L.P., TEXAS NAME
MERCANTILE INVESTMENT LLC,
TEXAS NAME INVESTMENT
CORPORATION, DELAWARE NAME
INVESTMENT CORPORATION, TEXAS
NAME CORPORATION (CAYMAN
ISALNDS), TEXAS NAME
CORPORATION (BRITISH VIRGIN
ISLANDS), TEJAS FRONTERA LAND
COMPANY, TEXAS NORMANDIE
INVESTMENT CORPORATION, TX
NORMANDIE CORP., ANUAR NAME
YAPUR, JESÚS NAME YAPUR, SIMÓN
NAME YAPUR, DANIELA REYNOSO,
MERCANTILE BUILDING COUNCIL OF
CO-OWNERS, and DOES 1–100,

    *Defendants.*

**CIVIL ACTION NO. 5:21-cv-01115-XR**

**JURY TRIAL DEMANDED**

### PLAINTIFFS' [PROPOSED] VERIFIED THIRD AMENDED COMPLAINT

1.    Plaintiffs, L.B. Benon Family Limited Partnership, Benon Marital Trust, Hasson Family Trust, and Greens Family Limited Partnership, bring this action against N.F. Mgt., Inc., and Texas Name Ltd., LP, for breach of contract; against Anuar Name Yapur, Jesús Antonio Name Yapur, and Simón Name Yapur for breach of fiduciary duty;

against Texas Name Mercantile Investment LLC, Anuar Name Yapur, Jesús Antonio Name Yapur, Simón Name Yapur, and Daniela Reynoso for conversion; and against Anuar Name Yapur, Jesús Antonio Name Yapur, Simón Name Yapur, Daniela Reynoso, and Texas Name Mercantile Investment LLC for civil conspiracy. Plaintiffs also bring this action for breach of fiduciary duty in the right of and on behalf of the Mercantile Building Council of Co-Owners (the "Condo Association") as members, co-owners, partners and/or shareholders and on behalf of all other such persons and/or entities similarly situated.[1]

## I.     <u>SUMMARY</u>

2.     This case is about three absentee landlords (defendants) and their efforts to extract maximum short-term gain from their majority control of a commercial condominium building while disregarding the interests of their co-owners in the property (plaintiffs).

3.     Through their actions, these absentee landlords have increased the costs to repair and maintain the condominium building, diminished its present value, and imperiled its future prospects as a business enterprise. These absentee landlords have also wrongfully deprived their co-owners of personal property.

4.     Accordingly, these absentee landlords are liable to their co-owners for breach of contract and breach of fiduciary duty under the various agreements explained

---

[1] The Court previously dismissed the following causes of action in this case:

    (i)      breach of contract/promissory estoppel against Texas Name Mercantile Investment LLC;

    (ii)     breach of fiduciary duty against N.F. Mgt., Inc., and Texas Name Mercantile Investment LLC, each in its individual capacity and as *alter ego* of the other;

    (iii)    third-party beneficiary breach of contract against Texas Name Mercantile Investment LLC in its individual capacity;

    (iv)    third-party beneficiary breach of contract against N.F. Mgt., Inc., and Texas Name Mercantile Investment LLC, each in its capacity as *alter ego* of the other.

*See* Order Granting In Part and Denying In Part Def. N.F. Mgt., Inc., and Def. Texas Name Mercantile Investment LLC's Mot. to Dismiss, Dkt. No. 40. Plaintiffs reassert none of these causes of action against N.F. Mgt., Inc., or Texas Name Mercantile Investment LLC.

    For clarity, the entity referred to as "Texas Name" in Plaintiffs' Second Amended Complaint, Dkt. No. 30, is Texas Name Mercantile Investment LLC (not any of the other entities named as Defendants here that include the phrase "Texas Name" in their names).

below, as well as for conversion.

5.     Additionally, the numerous shell entities that these absentee landlords control and from which they benefit are equally liable to plaintiffs under the alter ego doctrine, while their associates are liable for conspiring to aide them in their malfeasance.

6.     Finally, Plaintiffs assert derivative/representative claims herein on behalf of the Condo Association against Anuar Name Yapur, Jesús Antonio Name Yapur, and Simón Name Yapur due to breaches of their fiduciary duties owed to the Condo Association.

## II.     PARTIES

### A.     PLAINTIFFS

7.     Plaintiff, L.B. BENON FAMILY LIMITED PARTNERSHIP, is a California limited partnership. Its principal place of business is 1187 Coast Village Road, Suite 1-813, Santa Barbara, California 93108. It is citizen of California.

8.     Plaintiff, BENON MARITAL TRUST, is a California trust. Its principal place of business is 1187 Coast Village Road, Suite 1-813, Santa Barbara, California 93108. It is citizen of California.

9.     Plaintiff, HASSON FAMILY TRUST, is a California trust. Its principal place of business is 4817 Densmore Avenue, Encino, California 91436. It is citizen of California.

10.     Plaintiff, GREENS FAMILY LIMITED PARTNERSHIP, is a California limited partnership. Its principal place of business is 910 South El Camino Real, Suite A, San Clemente, California 92672. It is citizen of California.

11.     Plaintiffs, collectively, shall be referred to as such.

### B.     DEFENDANTS

12.     Defendant, N. F. MGT., INC. ("N.F. Mgt."), is a Texas corporation. Its principal place of business is 40 NE Loop 410, Suite 610, San Antonio, Texas 78216. N.F. Mgt. is a citizen of Texas. N.F. Mgt. has appeared in this litigation through counsel.

13.     Defendant MERCANTILE MANAGER LLC ("Mercantile Manager"), is a Delaware limited liability corporation. Its principal place of business is 40 NE Loop 410,

Suite 610, San Antonio, Texas 78216. Mercantile Manager is a citizen of Texas.

14.    Defendant, TEXAS NAME LIMITED, L.P. ("Texas Name Ltd."), is a Texas limited partnership. Its principal place of business is 40 NE Loop 410, Suite 610, San Antonio, Texas 78216. Texas Name Ltd. is a citizen of Texas.

15.    Defendant, TEXAS NAME MERCANTILE INVESTMENT LLC ("TNMI"), is a Delaware limited liability corporation. Its principal place of business is 40 NE Loop 410, Suite 610, San Antonio, Texas 78216. On information and belief, each of the members of TNMI is a citizen of Texas. TNMI is a citizen of Delaware and Texas. TNMI has appeared in this litigation through counsel.

16.    Defendant, TEXAS NAME INVESTMENT CORPORATION ("TNIC"), is a Texas corporation. Its principal place of business is 40 NE Loop 410, Suite 610, San Antonio, Texas 78216. TNIC is a citizen of Texas.

17.    Defendant, TEJAS FRONTERA LAND COMPANY ("Frontera"), is a Texas corporation. Its principal place of business is 40 NE Loop 410, Suite 610, San Antonio, Texas 78216. Frontera is a citizen of Texas.

18.    Defendant, TEXAS NORMANDIE INVESTMENT CORPORATION ("Normandie"), is a Texas corporation. Its principal place of business is 40 NE Loop 410, Suite 610, San Antonio, Texas 78216. Normandie is a citizen of Texas.

19.    Defendant, DELAWARE NAME INVESTMENT CORPORATION ("DNIC"), is a Delaware corporation. Its principal place of business is 40 NE Loop 410, Suite 610, San Antonio, Texas 78216. DNIC is a citizen of Delaware and of Texas.

20.    Defendant, TEXAS NAME CORPORATION ("TNC Offshore I"), is a Cayman Islands corporation. On information and belief, its principal place of business is 40 NE Loop 410, Suite 610, San Antonio, Texas 78216. TNC Offshore I is a citizen of the Cayman Islands and of Texas.

21.    Defendant, TEXAS NAME CORPORATION ("TNC Offshore II"), is a British Virgin Islands corporation. On information and belief, its principal place of business is 40 NE Loop 410, Suite 610, San Antonio, Texas 78216. TNC Offshore II is a

citizen of the British Virgin Islands and of Texas.

22.    Defendant, TX NORMANDIE CORP. ("TNC Offshore III"), is a British Virgin Islands corporation. On information and belief, its principal place of business is 40 NE Loop 410, Suite 610, San Antonio, Texas 78216. TNC Offshore III is a citizen of the British Virgin Islands and of Texas.

23.    Defendant, ANUAR NAME YAPUR ("A. Name Yapur"), is a natural person. On information and belief, A. Name Yapur is domiciled at 12114 Mission Trace St., San Antonio, Texas 78230, and is a citizen of Texas.

24.    Defendant, JESÚS ANTONIO NAME YAPUR ("J. Name Yapur"), is a natural person. On information and belief, J. Name Yapur is domiciled at Bosque de Eucaliptos 127, Bosques de las Lomas, Miguel Hidalgo, 11700, Mexico City, Mexico, and is a citizen of Mexico.

25.    Defendant, SIMÓN NAME YAPUR ("S. Name Yapur"), is a natural person. On information and belief, S. Name Yapur is domiciled at Bosque de Higueras 18, Bosques de las Lomas, Cuajimalpa de Morelos, 05120, Mexico City, Mexico, and is a citizen of Mexico.

26.    Defendant, DANIELA REYNOSO, is a natural person. On information and belief, Daniela Reynoso is domiciled at 2146 Bedford Stage, San Antonio, Texas 78213, and is a citizen of Texas.

27.    Defendants, DOES 1–50, are the unknown shell entities that A. Name Yapur, J. Name Yapur, and S. Name Yapur use to conceal their assets in the hope of evading liability for their wrongdoing.[2]

---

[2] These Doe defendants may include but are not limited to: COROFANY 101 and COROFANY 109, California limited liability companies the names of which appear to incorporate a short form of "*Coro*nado *Fa*milia *N*ame *Y*apur," Alanri 708 Inc., a Florida corporation, Hartford Universal Limited, a British Virgin Islands company, and Cervina Village International Limited, a British Virgin Islands company, as well as Winston Hills Management LLC, a Texas limited liability corporation, Towson Corp., a corporation of unknown citizenship, ANSI, Inc., a Texas corporation. Of these, the last three maintain their business address at 40 NE Loop 410, Ste. 610, San Antonio, TX 78216. On information and belief, A. Name Yapur is president of each of these companies, and N.F. Mgt. employee Daniela Reynoso has served as a notary for several.

28.    Defendant, MERCANTILE BUILDING COUNCIL OF CO-OWNERS ("Condo Association") is listed as a defendant—not because Plaintiffs assert claims against the Condo Association—but because this is how derivative/representative suits are traditionally styled. *See, e.g.*, *Providential Inv. Corp. v. Dibrell*, 320 S.W.2d 415, 428 (Tex. App.—Houston 1959, orig. proceeding). To be clear, Plaintiffs assert claims for breach of fiduciary duty *on behalf* of the Condo Association. The Condo Association is a Texas condominium association. Its principal place of business is 40 NE Loop 410, Suite 610, San Antonio, Texas 78216. The Condo Association is a citizen of Texas.

29.    Defendants, DOES 51–100, are the unknown individuals who have assisted A. Name Yapur, J. Name Yapur, and S. Name Yapur in the execution of their schemes.

30.    The entities identified in paragraphs 12 through 22 and in paragraph 27 shall be referred to collectively as the "N-Y Entities."

31.    The natural persons identified in paragraphs 23 through 25 shall be referred to collectively as the "N-Y Brothers."

32.    The N-Y Entities and the N-Y Brothers, *i.e.*, those entities and natural persons identified in paragraphs 12 through 25 and in paragraph 27, shall be referred to collectively as the "N-Y Defendants."

### III.    <u>JURISDICTION AND VENUE</u>

33.    Plaintiffs, all California citizens, filed their Original Petition in Texas Civil District Court in the County of Bexar, Texas ("Bexar County"). Wells Fargo, a South Dakota citizen, removed to the United States District Court for the Western District of Texas on diversity grounds, and Plaintiffs did not move to remand.[3] Because this Complaint names no California citizens as defendants, the Court retains jurisdiction over this action.

---

[3] By virtue of the Joint Stipulation to Dismiss filed on June 1, 2023, Dkt. No. 57, Wells Fargo is no longer a defendant.

## IV.   FACTS

### A.   INTRODUCTION

34.   The N-Y Brothers are the sons of Mluk Yapur Manzur and Mexican textile magnate and Lebanese émigré Simon Name Kuri, and they are heirs to their father's businesses and fortune. *See Recuerdo de Familia*, PROTOCOLO, Issue No. 43, 38–39 (translated from the original Spanish), *available at* http://bit.ly/3UQ3J4t.[4]

35.   According to Mexican press reports, the N-Y Brothers' companies, Textiles Nacionales, S.A. de C.V., and Modatelas, S.A.P.I. de C.V., are superlatively successful: Textiles Nacionales was once "the largest and most important fabric distributor in the Americas," and Modatelas is "the most important chain of stores in the Americas." *Id.*

36.   With their vast wealth, the N-Y Brothers have acquired numerous assets throughout Mexico and the United States, including but not limited to personal property, intellectual property, and, as relevant here, real property and business interests.[5]

37.   Among these assets are Units 2, 3, 4, 5, 6, and 7 in the Mercantile Building (the "Condo Building"), a commercial condominium established by a declaration recorded with Bexar County on September 9, 1982.

38.   The one remaining unit in the Condo Building, Unit 1, is owned by

---

[4] This issue of *Protocolo*, a self-described "foreign affairs and lifestyle" magazine, appears, due to its single subject matter, to be a special issue produced for Centro Libanés, A.C., also known as the Lebanese Center of Mexico.

[5] At least one of the N-Y Brothers has also used his wealth to acquire political clout: A. Name Yapur helped establish the chief fundraising committee for Mexico's Institutional Revolutionary Party—dubbed "the perfect dictatorship" by Nobel Prize winner Mario Vargas Llosa—in 1988. JOSÉ MARTINEZ, CARLOS SLIM: RETRATO INÉDITO 178 (2012); *Vargas Llosa: "Mexico es la Dictadura Perfecta,"* EL PAÍS, Aug. 31, 1990, https://elpais.com/diario/1990/09/01/cultura/652140001_850215.html. A. Name Yapur's compatriots on the committee included such luminaries as Carlos Slim Helú, later identified by Forbes magazine as the world's richest person from 2010 through 2013. *Id. See* Jesse Emspek, Sommer Anderson, and Yarilet Perez, *How Carlos Slim Built His Fortune*, INVESTOPEDIA, Jan. 26, 2023, https://www.investopedia.com/articles/investing/103114/how-carlos-slim-built-his-fortune.asp#citation-42. *See also* Alejandra Salas-Porras, The Mexican Business Class and the Processes of Globalization 251–254 (1996) (Ph.D dissertation, London School of Economics). Later, when christening his ill-fated luxury cruise line, A. Name Yapur called upon the then-President of Mexico Felipe Calderón to be present. Juan José Kochen and Martha Izquierdo, *Ofrecen Crucero 'Chatarra'*, REFORMA, Apr. 24, 2011 (2011 WLNR 7973467). That former President Calderón was a member of Mexico's National Action Party demonstrates A. Name Yapur's prioritization of financial interest over political ideology. A. Name Yapur's cruise line is further discussed below. *See infra* note 9.

Plaintiffs, who are family offices based in California.

39.    When it was built, the Mercantile Building consisted entirely of Class A office space,[6] and it was a shining beacon of San Antonio's early-1980s economic expansion.



Fig. 1. The Mercantile Building.

40.    And so it remained until the N-Y Brothers ran the building into the ground.

41.    Of course, the N-Y Brothers do not personally own Units 2 through 7 in the Condo Building. Rather, they own or have owned those units through one or more shell

---

[6] In the world of commercial real estate, "Class A includes the highest-quality buildings on the market." Matt Carrigan, *Class A vs. B vs. C Buildings: Commercial Real Estate Property Guide*, DEALPATH (Nov. 16, 2022), https://www.dealpath.com/blog/class-a-class-b-class-c-property-class/. Class A properties are the "[m]ost prestigious buildings competing for premier office users with rents above average for the area. Buildings have high quality standard finishes, state of the art systems, exceptional accessibility[,] and a definite market presence." Building Owners & Managers Ass'n International, Building Class Definitions, *available at* https://www.boma.org/BOMA/Research-Resources/Industry_Resources/BuildingClassDefinitions.aspx (last visited Apr. 14, 2023).

entities, which at various times have included Texas Name Ltd. and TNMI.[7]

42.    Those entities, like the others identified in paragraphs 12 through 22, above, are mere alter egos for the N-Y Brothers, who have treated and continue to treat the Condo Building as a piggy bank while utterly disregarding their duties to their co-owners. *See infra* Part IV.E (illustrating and discussing *alter ego* status in more detail).

43.    This action aims to right these wrongs.

## B.    THE CONDOMINIUM BUILDING'S GOVERNANCE AND OPERATION

44.    To understand the wrongdoing at issue in this case, it is necessary to understand the governance and operation of the Condo Building, which this section explains.

### 1.    Governing Documents

45.    The Condo Building is located at 40 NE Loop 410, San Antonio, Texas 78216. It consists of seven commercial condominiums, and it was declared a condominium when its construction was completed in 1982. As such, it is governed by a condominium declaration, the exhibits thereto, and agreements made pursuant to those documents.

46.    The condominium declaration—styled "Condominium Declaration – The Mercantile Building (A Condominium)" ("Condo Declaration") and recorded with Bexar County in 1982—established the Mercantile Building's condominium regime.

47.    The condominium bylaws—styled "Condominium Bylaws – The Mercantile Building (A Condominium)" ("Condo Bylaws") and recorded with Bexar County in 1982 as Exhibit B to the Condo Declaration—set forth the day-to-day governance of the Condo Building.

48.    A chart—styled only as "Exhibit 'D' to the Declaration of Condominium" and likewise recorded with Bexar County—sets forth the size of each unit and each owner's proportionate interest in the common elements of the building. *See infra* ¶¶ 50–

---

[7] Other potentially related entities include Palm Beach SA, LLC (89 Laurel Dr., Rancho Palos Verdes, CA 90275, LN#7016491550). *See also infra* ¶ 66 (noting Texas Name Ltd. transferred Units 2–7 to TNMI in 2014 for $10.00).

53.

49.    The Condo Declaration and Condo Bylaws are tightly interwoven documents. Each requires acceptance of and compliance with the other. Indeed, the Condo Declaration specifically states that the obligations contained in the Bylaws "run with the land" and burden all future interest holders in the property, including lessees, (*see* Condo Decl. at 1), while the Condo Bylaws state that "[t]he Owners and all other persons using, entering upon[,] or acquiring any interest in any Units or the Common Elements shall be subject to the provisions of" the Condo Declaration and Condo Bylaws. *See* Condo Bylaws § 3.03.

###    2.    Ownership Allocation

50.    Because the power to influence the governance of the Condo Building is proportional to the percentage of interest a unit owner has in certain elements of the building, it is important to understand the categories of ownership interests the Condo Declaration establishes.

51.    To wit, the Condo Declaration distinguishes between private elements of the building, *i.e.*, enclosed condominium "units," and two types of "Common Elements" of the building, *i.e.*, "General Common Elements" and "Limited Common Elements." *See* Condo Decl. ¶ 1(b), 1(c).

52.    The Condo Declaration also establishes that unit owners are "entitled to a percentage of ownership in the Common Elements as set forth in . . . Exhibit D." *See* Condo Decl. ¶ 5.

53.    Exhibit D shows that the owner of Unit 1 owns a 24.465% interest in the Condo Building's Common Elements. *See* Condo Decl. Ex. D. Therefore, Plaintiffs, who own 100% of Unit 1, own 24.465% of the Common Elements, and TNMI, which owns 100% of Units 2 though 7, own 75.535% of the Common Elements.

###    3.    Governing Bodies

54.    The Condo Declaration establishes a Condo Association, consisting of the owners of all the units in the Condo Building. *See* Condo Decl. ¶ 1(e). Management of the

Condo Building is vested in this Condo Association, and it is controlled by majority vote. *See* Condo Decl. ¶¶ 1(i), 9; Condo Bylaws § 3.01(a). Each unit owner is "entitled to cast a number of votes equal to the percentage of undivided interest in the Common Elements assigned to [its] Unit as set forth in Exhibit 'D.'" *See* Condo Decl. ¶ 9(c).

55.     Thus, on any Condo Association vote, TNMI is entitled to approximately 76% of the votes, and Plaintiffs are entitled to approximately 24% of the votes. *See* Condo Decl. ¶ 10. TNMI's approximately three-to-one advantage over Plaintiffs, coupled with its complete identity of interests with the other N-Y Defendants, renders Plaintiffs' votes meaningless because there is no scenario in which TNMI controls less than a supermajority of Condo Association votes.

56.     This same power imbalance is reflected on the Condo Association's Board of Directors ("Condo Board"), which is composed of the three N-Y Brothers and one Plaintiff representative, all of whom sit on the Condo Board in their individual capacities. That is, the N-Y Brothers control 75% of the Condo Board, whereas Plaintiffs control 25%. Therefore, the N-Y Defendants control a supermajority of both the Condo Association and Condo Board.

57.     Notwithstanding the N-Y Defendants' absolute control of the Condo Building's governing bodies, the Condo Association is vested with "the authority and responsibility . . . to maintain, repair, replace, operate, and regulate and manage the Common Elements" of the Condo Building. *See* Condo Decl. ¶ 9(a).

58.     Further, the Condo Board is required to "conduct regular and special meetings according to the Bylaws," and to "employ a professional management company ('Manager'), approved by a Majority of Owners, to perform such services and duties as set forth in the Bylaws." *See* Condo Decl. ¶ 9(b), 9(d). The Condo Board is also required to "determine" "convenient" times and places for meetings of the entire Condo Association. *See* Condo Bylaws § III(b).

### 4.    Day-to-Day Operations

59.     The day-to-day operations of the Condo Building are entrusted to a

building manager. As the Condo Bylaws stipulate:

> The daily operations of the Condominium Project shall be administered by Barry Gillingwater Management Company, or such other management organization as the majority in interest of the Owners shall designate (such managing agent being hereinafter referred to as the "Manager"). The Manager shall be responsible for the management, maintenance, operation[,] and administration of the Condominium Project and the Common Elements in accordance with the [Texas Condominium] Act, the Condominium Declaration, these Bylaws, and the rules and regulations adopted by the Owners with relation to the Condominium Project.

*See* Condo Bylaws § 3.03. The Bylaws also detail the building manager's duties, which include but are not limited to:

> (a)    Operation, care, upkeep[,] and maintenance of the [General] Common Elements . . ."[8]
>
> (b)    Determination of the Common Expenses required for the affairs of the Condominium Project, including, without limitation, the operation and maintenance of the Property;
>
> (c)    Collection of the common charges from the Owners;
>
> (d)    Employment and dismissal of the personnel necessary or advisable for the maintenance and operation of the [General] Common Elements; . . .
>
> (i)    Making of repairs, additions[,] and improvements to, or alterations of, the Property and repairs to and restoration of the Property in accordance with the other provisions of these Bylaws; and
>
> (j)    Enforcing obligations of the Owners, allocating income and expenses, and doing anything and everything else necessary and proper for the sound management of the Condominium Project.

*See* Condo Bylaws § 3.04.

60.    Thus, the Condo Building manager is tasked with full operational responsibility for upkeep of the Condo Building, while ultimate "authority and responsibility" for ensuring that the Condo Building manager performs its operational duties rests with the Condo Association, under the leadership of the N-Y–controlled Condo Board.

---

[8] Whereas the Condo Declaration distinguishes between Limited Common Elements and General Common Elements, the Condo Bylaws refer to the Limited Common Elements and the Common Elements, dropping "General" from their denomination of what the Condo Declaration calls the General Common Elements.

**C.    THE N-Y DEFENDANTS' WRONGDOING**

**1.    The N-Y Defendants Have Used the Condo Building as a Piggy Bank**

61.    The N-Y Defendants acquired a controlling interest in the Condo Building by 1992 through Texas Name Ltd. *See* Right of Entry Consent for Commercial Cable Television Service, Official Public Records of Real Property of Bexar County, Texas, vol. 5622, p. 338 (1993) (showing Texas Name Ltd. filed an easement in the Condo Building to KBL Cable Systems of the Southwest, Inc., on Apr. 8, 1993).

62.    That interest included ownership of Units 2 through 7 in the Condo Building.

63.    Throughout their ownership, the N-Y Defendants have repeatedly borrowed against the value of their interests in the Condo Building.

64.    For example, in 1992, Texas Name Ltd. borrowed $3,500,000 against Units 2 through 7 (approximately $7,723,587 in 2023 dollars). In 1996, Texas Name Ltd. borrowed $5,050,000 against Units 2 through 7 (approximately $9,969,379 in 2023 dollars). In 2004, Texas Name Ltd. borrowed a total of $12,000,000 against Units 2 through 7 across two notes (approximately $19,672,051 in 2023 dollars). In 2006, Texas Name Ltd. borrowed $5,127109.67 against Units 2 through 7 across five notes (approximately $7,875,182 in 2023 dollars). In 2012, Texas Name Ltd. borrowed $1,000,000 against Units 2 through 7 (approximately $1,348,655 in 2023 dollars).

65.    In 2013, Texas Name Ltd. borrowed $1,293,343.42 (approximately $1,719,093 in 2023 dollars) against Units 2 through 7 for the benefit of Naviera Mexicana S.A. de C.V., a Mexican corporation that, on information and belief, is related to failed Mexican cruise ship company, Ocean Star Cruises, a.k.a. Corporación de Cruceros Nacionales S.A., of which A. Yame Napur was owner and chairman.[9]

---

[9] The N-Y Defendants' willingness to allow their assets to deteriorate while extracting short-term gains from them is not limited to the Condo Building. According to contemporary news reports, the Ocean Star Cruises' flagship, the MV Ocean Star Pacific, was in substandard conditions by the time of its second voyage, and passengers suffered substandard service. Juan José Kochen and Martha Izquierdo, *Ofrecen Crucero 'Chatarra'*, Reforma, Apr. 24, 2011 (2011 WLNR 7973467). Ultimately, the ship

66.    On June 26, 2014, Texas Name Ltd. transferred ownership of Units 2 through 7 to TNMI for $10.00. On June 30, 2014, TNMI borrowed $19,100,000 against Units 2 through 7 (approximately $24,982,180 in 2023 dollars). That the property supposedly increased in value by almost 2,000,000% in the span of four days demonstrates that the Texas Name Ltd.-to-TNMI transfer was not a *bona fide* sale between arms-length enterprises but a transfer from one N-Y Brothers' shell corporation to another—both controlled by and for the sole benefit of the N-Y Brothers.

67.    In total, the N-Y Defendants borrowed over $73,000,000 against Units 2 through 7 in inflation-adjusted dollars. [10]

68.    On information and belief, none of these sums were used to maintain or repair any portion of the Condo Building.

### 2.    The N-Y Defendants Lined Their Pockets by Hiring Themselves to Manage the Condo Building

69.    On January 1, 2014, Texas Name Ltd. and N.F. Mgt. executed a Property Management Agreement ("Management Contract"). Under this agreement, N.F. Mgt. was to serve as the manager of the Condo Building as that role is described in the Condo Declaration and Condo Bylaws, as is evident from the Management Contract's description of the building manager's responsibilities:

> Manager shall manage the Property in a manner commensurate with that of first-class property managers of real properties of a size, character[,] and quality comparable to the Property. . . . Manager shall make available to Owner full benefit of the judgment, experience, and advice of the members of Manager's organization and staff with respect to the policies and activities to be pursued and carried out by Owner in operating the Property, and will perform such services as may reasonably be requested by owner in operating, maintaining, servicing[,] and improving the Property.

---

required an emergency evacuation of all of its 515 passengers because it caught fire, lost power, and took on water. *See* Martha Izquierdo, *Evacuan en Huatulco Crucero Mexicano*, EL NORTE, April 17, 2011 (2011 WLNR 7485423).

[10] The inflation-adjusted dollar values shown in paragraphs 64 through 66 were determined using the inflation calculator provided by the Federal Reserve Bank of Minneapolis on its website. *See* Federal Reserve Bank of Minneapolis, Inflation Calculator, https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator (last visited May. 9, 2023).

*See* Management Contract, art. 3.1. Both the hiring of N.F. Mgt. by Texas Name Ltd. and the supervision of their agreement have injured and continue to injure Plaintiffs.

70.     On information and belief, N.F. Mgt. is so named as a short form of "Name Family Management," and its sole owners are the N-Y Brothers. In other words, like the other N-Y Entities, N.F. Mgt. is a shell company for the N-Y Brothers. *See infra* Part IV.E. So when Texas Name Ltd. hired N.F. Mgt. on behalf of the Condo Board, the N-Y Brothers were, in effect, hiring themselves.

71.     This is an unresolvable conflict of interest because it incentivizes N.F. Mgt. to inflate its assessments and fees while minimizing its costs by doing as little and as low-quality work as possible, all the while knowing that Plaintiffs are powerless to challenge this misconduct before the Condo Association or Condo Board because both are controlled by the same three individuals who control N.F. Mgt.—the N-Y Brothers. This incentive arises because any fees paid to N.F. Mgt. by the other N-Y Entities are simply money moved from one N-Y Defendant pocket to another, whereas fees paid to N.F. Mgt. by Plaintiffs, whether directly or indirectly, are new revenue moved from Plaintiffs' pockets to the N-Y Defendants' pockets.

### 3.     The N-Y Defendants Failed to Hire a Professional Building Manager

72.     The hiring of N.F. Mgt. breached the duty, by and through the Condo Board (controlled by the N-Y Brothers), to "employ a *professional* management company" because N.F. Mgt. is not one. *See* Condo Decl. ¶ 9(d) (emphasis added).

73.     On information and belief, N.F. Mgt. did not operate before 2014, had not then managed and to this day does not manage any real property other than three commercial buildings and four residential homes all owned by the N-Y Brothers in San Antonio.

74.     Furthermore, the principal point of contact for N.F. Mgt. identified in the Management Contract is one Daniela Reynoso. On information and belief, when Ms. Reynoso was hired by N.F. Mgt., she was a bank teller with no property management experience. Today, she claims to be a "[s]trong real estate professional," but her self-

identified skillset only includes financial management skills—"[b]udgeting, [b]anking, [s]ales, [a]ccounting, and [a]sset [m]anagement"—not operational building management skills. *See* LinkedIn, Daniela Reynoso, https://www.linkedin.com/in/daniela-reynoso-066a4038/ (last visited Apr. 20, 2023). In any event, to the extent Ms. Reynoso has gained any practical property management skills over the years, she did not receive her certification in property management until 2020—a full six years after N.F. Mgt. signed its contract with Texas Name Ltd. *See id.* Moreover, the actual state of the Condo Building negates any assertion that Reynoso has the knowledge, will, or ability to lead a "professional property management company." *See infra* Part IV.C.4.

75.     Finally, N.F. Mgt. does not even maintain a website, a practical prerequisite for any business that intends to market itself to the public. *See* NFManagement.com (last visited Apr. 20, 2023) (showing only a parked internet domain).

76.     Therefore, N.F. Mgt. is not a professional management company, and the N-Y Brothers, through their control of the Condo Board, violated Section 9(d) of the Condo Declaration.

**4.     The N-Y Defendants Failed to Maintain or Repair the Condo Building**

77.     As noted, the Management Contract requires N.F. Mgt. to "manage the Property in a manner commensurate with that of first-class property managers." *See* Management Contract, art. 3.1. The Management Contract further elaborates upon that responsibility as follows:

> Manager shall review and be familiar with each of the tenant leases affecting the Property, including, without limitation, the Owner's and tenants' repair and maintenance obligations under each of the tenant leases. Subject to any limitations imposed by Owner in this Agreement or otherwise, Manager shall at all times cause the buildings, appurtenances, and grounds of the Property to be operated ana maintained in a first class manner according to standards acceptable to Owner, such operation and maintenance to include but not be limited to (1) operating and maintaining all mechanical, electrical, fire alarm, elevators, escalators, plumbing[,] and other major and minor systems in the Property, (2) providing security and performing (or causing to be performed) exterior (including parking area) and interior cleaning, painting, decorating, plumbing, steam fitting, carpentry, landscaping, roofing, maintenance of the central plant and

heating, ventilating and air conditioning systems and such other normal maintenance, repair work, work station reconfiguration and minor construction as may be necessary or required by Owner, (3) investigating all necessary preventative maintenance programs, submitting to owner recommendations and proposals for such programs and performing such necessary or desirable preventative maintenance as shall be approved by Owner, (4) purchasing supplies, materials[,] and services, (5) executing contracts in the name of Owner subject to the prior written approval of Owner and in accordance with the provisions of this Agreement, for security service, utilities, vermin extermination, cleaning service, recycling/separation program, rubbish removal, plumbing, roof maintenance, painting, carpentry and lock repair, switch gear maintenance[,] and all other necessary and advisable service required to maintain a first class building, . . . (6) regularly inspecting and testing, in accordance with existing inspection and testing programs at the Property, the physical condition of the Property, including: (i) at least once each month, an inspection at night to observe and log, among other things, the janitorial crews, exterior lighting, and security at the Property, (ii) periodic testing of the systems to ensure their reliability, with such tests to be scheduled and coordinated with occupants of the Property to minimize risk to the business operations, and (iii) any additional inspections that will improve the appearance, operation, and life safety aspects of the Property, as determined by Owner or Manager in accordance with applicable local law, . . . and (10) any other activity expedient to the normal operation of any first-class office building.

*See* Management Contract, art. 3.8.

78.    Instead of taking care to fulfill these obligations, N.F. Mgt. has allowed the Condo Building to deteriorate by failing to perform necessary maintenance and repairs. At present, necessary repairs to the Condo Building include but are not limited to: (i) pavements on site are past their expected service life and need to replaced; (ii) skylights need refurbishing; (iii) roof needs to be repaired to code; (iv) ribbon windows allowing water intrusion need to be repaired; (v) window walls allowing water intrusion need to be repaired; (vi) granite panels need sealants repaired; (vii) weatherstripping needs to be replaced on exterior doors; (viii) retaining walls need crack repair and recoating; (ix) garage needs redirection of drainage; (x) garage needs the removal of loose or partially detached concrete on overhead surfaces; (xi) soil retaining panels need excavation and reposition to create even ground levels adjacent to the foundation; (xii) fire protection and life safety issues need immediate remediation throughout the building, parking

garage, and surrounding area; (xiii) cooling tower drainage needs to brought up to code to prevent dangerous storm drainage; (xiv) machinery room needs new refrigerant gas detection systems; (xv) fire protection on penthouse wall is inadequate; (xvi) clearance needs to be added between air compressors and adjacent equipment; (xvii) all control systems related to the thermostat need to be replaced; (xviii) obsolete pneumatic systems need to be replaced; (xix) fire protection systems, incorrectly located, need to be redesigned; (xx) rusted and corroded AHU systems need to be replaced; (xxi) eye-wash station in the mechanical room needs to be relocated; (xxii) highly flammable items near electrical equipment in mechanical room need to be removed and relocated to a safe location; (xxiii) fire pumps need to be relocated to code; xxiv) jockey pump controller need to be relocated to code; (xxv) excess fuel needs to be stored in a proper enclosure; (xxvi) all root-breached underground piping needs to be replaced; and (xxvii) cracked, deteriorated, or corroded sanitary piping needs to be replaced.

79.    At the same time, the parties with the power to enforce the Management Contract and ensure N.F. Mgt.'s performance thereunder—that is Texas Name Ltd., TNMI, and the N-Y Brothers—all failed to do so.

**5.    The N-Y Defendants Misappropriated and Converted Plaintiffs' Funds**

80.    The N-Y Brothers also stole from Plaintiffs by pocketing litigation settlement funds that should have been used to repair storm damage to the Condo Building.

81.    In 2016, a "wind and hailstorm" severely damaged the roof of the Condo Building. *See Texas Name Mercantile Investment, LLC v. Cincinnati Ins. Co.*, Case No. 17-cv-1196-XR, Pl.'s Original Pet., Dkt. No. 4-1, ¶¶ 9–10. TNMI then filed a claim against this damage with Cincinnati Insurance Company, with whom it had insured the Condo Building. *Id.* ¶ 11. TNMI balked at Cincinnati Insurance's repair estimate of approximately $80,000 as too low. *Id.* ¶¶ 12–14. Instead, TNMI alleged that the roof required at least $4,000,000 in repairs. *Id.* ¶ 16. Cincinnati refused to pay. *Id.* ¶ 17. In 2017, TNMI filed suit against Cincinnati Insurance to recover that amount in actual damages,

along with treble damages, an eighteen percent statutory penalty, compensatory damages, exemplary damages, and fees, on numerous theories. *Id.* ¶ 16, 53–59.

82.    In 2018, TNMI's suit against Cincinnati Insurance was settled for a confidential amount. *See Texas Name Mercantile Investment, LLC v. Cincinnati Ins. Co.*, Dkt. No. 19. Plaintiffs have been confidentially informed that amount was approximately $1,300,000. After attorneys' fees, $867,000 remained. TNMI then spent $230,000 on repairs. The remainder was either kept by TNMI or passed from TNMI to the N-Y Brothers. Either way, $637,000—the difference between $867,000 and $230,000—was misappropriated because Plaintiffs were entitled to have the full $867,000 spent on repairs to the Condo Building. This is so because the basis of TNMI's suit against Cincinnati Insurance was the insurer's failure to pay for repairs to General Common Elements of the building, which Plaintiffs own in common with the other unit owners. *See* Condo Decl. ¶ 3(b). This undivided interest in the General Common Elements includes an undivided interest in all derivative income, including insurance payouts and legal settlements. Therefore, when TNMI kept the Cincinnati Insurance settlement money for itself or when the N-Y Brothers took it from TNMI, these Defendants converted Plaintiffs' personal property.

83.    On information and belief, this scheme was orchestrated by the N-Y Brothers and Daniela Reynoso. The N-Y Brothers acted in their roles as the sole owners and directors of TNMI, a company with no employees,[11] and of N.F. Mgt., the Condo Building manager. The N-Y Brothers caused TNMI to file suit against Cincinnati Insurance. Reynoso acted in her role as manager of N.F. Mgt. and at the N-Y Brothers' direction to oversee the assessments made of the storm damage at issue in TNMI's 2017 suit and to oversee the insufficient repairs performed on the building after receipt of the Cincinnati Insurance settlement in 2018. Thus, the N-Y Brothers used TNMI to file suit against Cincinnati Insurance and relied on Reynoso, thus using N.F. Mgt., to limit the

---

[11] *See infra* Part IV.E.

amount of the settlement spent on repairs so they could misappropriate for themselves settlement money that Plaintiffs were entitled to have spent on repairs to General Common Elements of the Condo Building.

### 6. The N-Y Defendants Fraudulently Concealed Their Wrongdoing

84.    On information and belief, since the time that the N-Y Brothers took control of the Condo Building and in violation of their duties under the Condo Declaration: (i) the N-Y Brothers have never held a meeting of the Condo Board, (ii) the Condo Board has never called a meeting of the Condo Association, and (iii) the Condo Association has never held a vote on any matter.

85.    By these means, the N-Y Brothers knowingly created the false impression and implied assurance that the Condo Building was being ably maintained and repaired by their wholly owned entity, N.F. Mgt.

86.    Plaintiffs relied on that impression and trusted that the N-Y Brothers would, either directly or through N.F. Mgt., inform Plaintiffs if that were not the case.

87.    By failing to call meetings of the Condo Board or Condo Association, let alone hold any actual votes, the N-Y Brothers also denied Plaintiffs the opportunity to inquire formally about the state of the Condo Building.

88.    Likewise, neither the N-Y Defendants nor Daniela Reynoso ever informed Plaintiffs of the hail damage that the roof allegedly suffered in 2016, nor of TNMI's subsequent lawsuit and settlement.

### D.    THE N-Y DEFENDANTS' MALFEASANCE CAUSED INJURY TO PLAINTIFFS

89.    The N-Y Defendants' above-described malfeasance caused the Condo Building to fall into disrepair, and thus caused injury to Plaintiffs.

90.    The costs of the maintenance and repairs identified above and of other maintenance and repairs required by the Condo Declaration, Condo Bylaws, and Management Contract are the subject of ongoing expert analysis but, on information and belief, are expected to exceed $27,000,000. *See supra* ¶ 78.

91.    The degree of damage caused to the building by the N-Y Defendants' failures to perform their duties is compounded by deferral of the maintenance and repair required to be performed pursuant to the Condo Declaration, Condo Bylaws, and Management Contract.

92.    Thus, the N-Y Defendants have, by failing to perform their duties, increased the portion of the maintenance and repair costs that will be borne by Plaintiffs as *pro rata* payors of any such assessments as may ultimately be made to repair the Condo Building to the standard of Class A office space as would be performed by a "first class manager."

93.    The N-Y Defendants have, by failing to perform their duties, also decreased the marketability of the Condo Building to tenants, generally, and decreased the value of Unit 1, whether for lease or sale, specifically.

94.    Additionally, the N-Y Defendants and Daniela Reynoso caused injury to Plaintiffs by wrongfully exerting exclusive dominion and control over Plaintiffs' personal property in the form of settlement funds in which Plaintiffs had an interest.

95.    The N-Y Brothers also injured Plaintiffs by breaching their fiduciary duties to Plaintiffs.

96.    Finally, the N-Y Defendants and Daniela Reynoso have caused injury to Plaintiffs by concealing their wrongdoing.

97.    In sum, the N-Y Defendants and Daniela Reynoso caused injury to Plaintiffs in numerous ways, including as follows: (i) the N-Y Brothers breached their fiduciary duty of loyalty to Plaintiffs by hiring N.F. Mgt., which the N-Y Brothers own; (ii) the N-Y Brothers breached their fiduciary duty to Plaintiffs by hiring a non-professional management company, N.F. Mgt.; (iii) N.F. Mgt. breached its contractual duty to maintain and repair the Condo Building, including the Common Elements, to the standard required by the Management Contract and for the benefit of all condo owners, including Plaintiffs; (iv) the N-Y Brothers breached their fiduciary duty to enforce the Management Contract; (v) Texas Name Ltd. breached its duty to enforce the Management Contract for the benefit of all condo owners, including Plaintiffs; (vi) TNMI, the N-Y

Brothers, and Daniela Reynoso converted Plaintiffs' personal property; (vii) the N-Y Defendants and Daniela Reynoso fraudulently concealed the maintenance and repair needs of the Condo Building by failing to disclose them and denying Plaintiffs opportunities to learn about them; (viii) the N-Y Defendants and Daniela Reynoso fraudulently concealed their conversion of Plaintiffs' property by failing to disclose them and denying Plaintiffs opportunities to learn about them; and (ix) the N-Y Defendants and Daniela Reynoso conspired to accomplish some or all of these things.

*Continued on the next page.*

### E.    COMPLETE IDENTITY OF INTERESTS: ALTER EGO AND CONSPIRACY

98.    Parts IV.C and IV.D of this Complaint illustrate that each of the N-Y Entities is an *alter ego* of the N-Y Brothers.

99.    Public records also support this conclusion by revealing a tight web of interrelationships among the N-Y Entities, the N-Y Brothers, and their surrogate, Daniela Reynoso. The diagram below illustrates the relationships revealed in the N-Y Defendants' own Texas and Delaware public tax filings.[12]



Fig. 2. The relationships among the N-Y Defendants and their agents. *See also infra* ¶ 110 (elaborating upon the various entities' interconnectedness).

---

[12] TNIC's 2021 Texas Franchise Tax Public Information Report contains an internal inconsistency: it identifies Texas Name Corporation of the Cayman Islands as its 98 percent owner and also identifies Texas Name Corporation of the British Virgin Islands as its 100 percent owner. Because Plaintiffs do not know which of Defendants' conflicting declarations is accurate, Plaintiffs have mapped both entities to Figure 2.

100. As shown in Figure 1, the boards of directors of the N-Y Entities almost entirely overlap. TNMI, N.F. Mgt., Texas Normandie Investment Corp., and TNIC have identical boards, composed only of the three N-Y Brothers. DNIC's board is composed only of A. Name Yapur and Frontera. Texas Name Ltd.'s board is composed solely of TNIC and DNIC. And Frontera's board is composed only of A. Name Yapur, J. Name Yapur, and one Isaac Saba Raffool, a man who has been dead since 2008.[13]

101. Similarly, the ownership structure of the N-Y Entities tightly overlaps. Indeed, several of the N-Y Entities appear to exist solely to hold ownership in each other or to act as agents or managers of the other.

102. Further, except for the three entities formed in Caribbean tax havens, every entity and individual appearing in Figure 2 asserts Suite 610 of the Condo Building as its address of record. That is unsurprising because, on information and belief, of the myriad N-Y Entities, the only one to have any employees at all is N.F. Mgt., N.F. Mgt. occupies Suite 610 of the Condo Building, and that suite houses the office of exactly one professional employee—Daniela Reynoso. A regular player in the N-Y Brothers' troupe, Reynoso often serves, *inter alia*, as a notary for the N-Y Brothers' various businesses, including those located in the British Virgin Islands. *See supra* note 3.[14] On information and belief, Reynoso is a knowing participant in the N-Y Defendants' schemes.

103. This uniform sharing of business addresses in public filings, as well as the sharing of a common agent and employee, shows the N-Y Entities and N-Y Brothers to

---

[13] Plaintiffs are informed and believe that the Isaac Saba Raffool declared by A. Name Yapur in 2022 to be the Vice-President and Secretary of Frontera in the company's Texas Franchise Tax Public Information Report is a deceased Mexican businessman who was, six years prior to his death, identified by Forbes magazine as the 445th richest person in the world. *See Isaac Saba Raffoul & Family*, FORBES.COM, *available at* https://web.archive.org/web/20060906131531/http://www.forbes.com/finance/lists/10/2003/LIR.jhtml?passListId=10&passYear=2003&passListType=Person&uniqueId=M12Y&datatype=Person; *Who Were the Richest Mexicans of the Last Twenty Years?*, INFOBAE, July 5, 2021, 2021 WLNR 21764726 (identifying Isaac Saba Raffoul as the seventh richest).

[14] The Virgin Islands, of course, are a notorious haven for shell companies designed to hide their owners' assets. *See generally*, Peter Whoriskey, *Secret Trove Illuminates the Lives of Billionaires*, WASH. POST, Oct. 6, 2021 (2021 WLNR 32793008).

share a complete identity of interests.

104.    The Management Contract between N.F. Mgt. and Texas Name Ltd. likewise manifests the identity of interests among the N-Y Defendants. *First*, the Management Contract reveals a closed loop of relationships (i) by identifying A. Name Yapur as the point of contact for Texas Name Ltd. but (ii) giving as his address that of the headquarters of Modatelas, the N-Y Brothers' textile and retail conglomerate, and (iii) requiring that correspondence to both Texas Name Ltd. and N.F. Mgt. be copied to one Jordi Ferran while (iv) giving Ferran's address as that of Suite 610 in the Condo Building for N.F. Mgt. correspondence and that of the Modatelas headquarters for Texas Name Ltd. correspondence. *See* Management Contract, art. 18.1; MODATELAS, https://www.modatelas.com.mx/contacto (last visited May 17, 2023). *Second*, the continuous provision of services under the Management Contract from 2014 to present shows TNMI and Texas Name Ltd. to share a unity of interest. The Management Contract provides that it "shall terminate in its entirety in the event of a sale or other disposition of the Property to a person or entity other than [Texas Name Ltd.] or an affiliate of [Texas Name Ltd.]." *See* Management Contract, art. 2.2. Because Units 2 through 7 were transferred from Texas Name Ltd. to TNMI in 2014 and no N-Y Defendant contends that the Management Contract thereby terminated, Texas Name Ltd., TNMI, and N.F. Mgt. necessarily admit that TNMI is an "affiliate" of Texas Name Ltd.

105.    The money trail, to the extent publicly available, also reveals the coextensive nature of the N-Y Defendants. For example, that Texas Name Ltd. "sold" Units 2 through 7 in the Condo Building to TNMI for a mere $10.00 demonstrates the unity of interest and continuity between the two companies. *See supra* ¶ 66. That TNIC is the sole general partner of Texas Name Ltd. and the sole manager of TNMI demonstrates the same. And while information about the beneficial ownership of many of the N-Y Entities is not publicly available (and as to the offshore entities is notoriously shielded by foreign law), Plaintiffs are informed and believe that all of the N-Y Entities are ultimately owned and controlled, directly, or indirectly, by the N-Y Brothers.

106.    Thus, public records, private contracts, and transaction history all make clear that the numerous entities owned and controlled by the N-Y Brothers, either directly or indirectly, are mere tools, conduits, or instrumentalities—that is, *alter egos*—of the N-Y Brothers. Therefore, there is such complete identity of interests between the N-Y Entities and the N-Y Brothers that the separateness of the entities from the natural persons is illusory, and asserting jurisdiction over only the N-Y Entities or the N-Y Brothers would result in injustice to Plaintiffs.

107.    Additionally, the N-Y Brothers, by and through their control of the N-Y Entities, conspired with the N-Y Entities to perpetrate their wrongdoing and effectuate their schemes.

108.    The N-Y Defendants likewise conspired with Daniela Reynoso in her role as the operational chief of N.F. Mgt. and all-purposes agent of the N-Y Defendants, as well as with numerous unknown individuals.

109.    The N-Y Entities and N-Y Brothers are jointly and severally liable for each other's acts and omissions as *alter egos* of each other, and the N-Y Defendants and Daniela Reynoso are jointly and severally liable as coconspirators.

110.    For the avoidance of doubt, Plaintiffs allege each of the following facts as to the relationships between the parties as illustrated in Figure 2: (i) the N-Y Brothers are all directors of all the N-Y Entities; (ii) Frontera is a director of DNIC; (iii) DNIC is an owner of Texas Name Ltd.; (iv) TNC Offshore I is an owner of TNIC; (v) TNC Offshore II is an owner of TNIC; (vi) TNIC is the general partner of Texas Name Ltd.; (vii) TNIC is the manager of TNMI; (viii) N.F. Mgt. is the registered agent of TNIC; (ix) N.F. Mgt. is the registered agent of Texas Name Ltd.; (x) N.F. Mgt. is the registered agent of Texas Normandie Investment Corp.; (xi) TNIC is the manager of Texas Normandie Investment Corp.; (xii) TNC Offshore III is the owner of Texas Normandie Investment Corp.; (xiii) Daniela Reynoso is the manager of N.F. Mgt.; (xiv) Daniela Reynoso is the registered agent of TNMI; (xv) A. Name Yapur is the registered agent of Frontera; (xvi) S. Name Yapur is the registered agent of TNIC; (xvii) Texas Name Investment Corp. is its own

agent;[15] and (xviii) N.F. Mgt. is its own agent.[16]

111.    On information and belief, Plaintiffs further allege that the N-Y Brothers are the sole owners and directors of TNC Offshore I, TNC Offshore II, TNC Offshore III, DNIC, TNMI, Mercantile Manager, and N.F. Mgt.)

## V.    CAUSES OF ACTION

### A.    FIRST CAUSE OF ACTION: BREACH OF CONTRACT—THIRD PARTY BENEFICIARY

#### 1.    Claim 1: By Plaintiffs Individually, Against N.F. Mgt.

112.    Plaintiffs hereby incorporate by reference paragraphs 1 through 111 of this Complaint as though restated fully here.

113.    The Property Management Agreement is a contract between Texas Name Ltd. and N.F. Mgt. to manage the Condo Building.

114.    TNMI assumed the rights and responsibilities of Texas Name Ltd. under the Property Management Agreement when TNMI purchased Units 2 through 7 from Texas Name Ltd.

115.    The Parties do not dispute the validity of the Property Management Agreement.

116.    Texas Name Ltd. and N.F. Mgt. executed this contract, and TNMI subsequently ratified it, with the intent to confer upon Plaintiffs the direct benefit of maintenance and repair of all areas of the Condo Building.

117.    Accordingly, Plaintiffs are proper parties to sue for breach of the contract because they are third-party beneficiaries of this contract. Moreover, Plaintiffs have no duties to perform under the contract.

118.    N.F. Mgt. failed to perform its duty under this contract to manage the Condo Building "in a manner commensurate with that first-class property managers of real properties of a size, character[,] and quality comparable to the [Condo Building]."

---

[15] Though circular, this is what the company's Texas Franchise Tax Public Information Report declares.

[16] *Id.*

*See* Property Management Agreement, art. 3.1.

119.    N.F. Mgt.'s breach caused Plaintiffs' damages.

120.    Plaintiffs' damages include, *inter alia*, maintenance and repair costs and diminution in value of their interest in the Condo Building.

121.    Therefore, having breached its duty to Plaintiffs (as third-party beneficiaries of its contract with Texas Name Ltd. and TNMI) and thereby caused Plaintiffs' damages, N.F. Mgt. is liable to Plaintiffs for breach of contract.

**2.    Claim 2: By Plaintiffs Individually, Against Texas Name Ltd.**

122.    Plaintiffs hereby incorporate by reference paragraphs 1 through 111 of this Complaint as though restated fully here.

123.    Plaintiffs incorporate by reference paragraphs 112 through 118 of this Complaint as though restated fully here.

124.    Texas Name Ltd.'s failure to enforce its contract with N.F. Mgt. caused Plaintiffs' damages.

125.    Plaintiffs' damages include, *inter alia*, maintenance and repair costs and diminution in value of their interest in the Condo Building.

126.    Therefore, having breached its duty to Plaintiffs (as third-party beneficiaries of its contract with N.F. Mgt.) and thereby caused Plaintiffs' damages, Texas Name Ltd. is liable to Plaintiffs for breach of contract.

**B.    SECOND CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY (BY PLAINTIFFS INDIVIDUALLY, AGAINST THE N-Y BROTHERS)**

127.    Plaintiffs hereby incorporate by reference paragraphs 1 through 111 of this Complaint as though restated fully here.

128.    Condominium board members owe a fiduciary duty to unit owners such as Plaintiffs.

129.    A fiduciary owes its principal a duty of loyalty, good faith, fair dealing, honest performance, and strict accountability.

130.    A. Name Yapur, J. Name Yapur, and S. Name Yapur were Condo Board

members.

131.    Therefore, in their individual capacities, the N-Y Brothers each owed a fiduciary to all unit owners, including Plaintiffs.

132.    Despite having a supermajority of votes on the Condo Board and the Condo Association, which gave them unfettered power to meet their fiduciary duties, the N-Y Brothers each breached their fiduciary duty to Plaintiffs in a number of ways, including without limitation: (i) by failing to enforce the Management Contract; (ii) by allowing the Condo Building to fall into disrepair; (iii) by failing to hold regular meetings of the Condo Board and Condo Association; and (iv) by self-dealing through the hiring of N.F. Mgt. as building manager. In so doing, the N-Y Brothers acted individually to breach fiduciary duties independently owed to Plaintiffs.

133.    These breaches proximately caused injury to Plaintiffs and resulted in a benefit to the N-Y Brothers.

134.    Plaintiffs' injuries include, *inter alia*, costs of maintenance and repair and diminution in value of their interest in the Condo Building, as well as injury to the relationship of trust between principal and agent.

135.    Therefore, the N-Y Brothers are liable to Plaintiffs for breach of fiduciary duty.

**C.    THIRD CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY (ON BEHALF OF THE CONDO ASSOCIATION, AGAINST THE N-Y BROTHERS)**

136.    Plaintiffs hereby incorporate by reference paragraphs 1 through 111 of this Complaint as though restated fully here.

137.    Condominium board members owe a fiduciary duty to their condominium association, including the duties of obedience, loyalty, and due care.

138.    A. Name Yapur, J. Name Yapur, and S. Name Yapur were Condo Board members.

139.    Therefore, the N-Y Brothers each owed a fiduciary to the Condo Association.

140.   Plaintiffs are members, co-owners, partners and/or shareholders of the Condo Association, and were members, co-owners, partners and/or shareholders of the Condo Association at all times relevant to the acts and/or omissions made the basis of this proceeding, including at the time of the acts, omissions and/or transaction(s) complained of.

141.   Plaintiffs fairly and adequately represent the interests of the Condo Association and the interests of other members, co-owners, partners and/or shareholders similarly situated in enforcing rights of the Condo Association.

142.   Despite having a supermajority of votes on the Condo Board and the Condo Association, which gave them unfettered power to meet their fiduciary duties, the N-Y Brothers each breached his fiduciary duty to the Condo Association in a number of ways, including without limitation: (i) by failing to enforce the Management Contract; (ii) by allowing the Condo Building to fall into disrepair; (iii) by failing to hold regular meetings of the Condo Board and Condo Association; and (iv) by self-dealing through the hiring of N.F. Mgt. as building manager.

143.   These breaches proximately caused injury to the Condo Association and benefited the N-Y Brothers.

144.   The Condo Association's injuries include, *inter alia*, costs of maintenance and repair and diminution in value of the Condo Building, as well as injury to the relationship of trust between principal and agent.

145.   Therefore, the N-Y Brothers are liable to the Condo Association for breach of fiduciary duty.

146.   Plaintiffs have attempted to obtain the desired action from the N-Y Brothers and the Condo Board by instituting this litigation against them. However, because the N-Y Brothers possess a supermajority of votes on the Condo Board and the Condo Association, they have unfettered power to neglect the Condo Association's interests in favor of their own, thereby breaching their fiduciary duties to the Association. In fact, the N-Y Brothers have appeared to show no interest in meeting their fiduciary duties to the

Condo Association. To the degree Plaintiffs have not taken additional efforts to obtain the desired action from the N-Y Brothers and the Condo Board, they have not done so because such efforts would have been futile given that the N-Y Brothers control approximately 76% of the Condo Association votes, and Plaintiffs are entitled to only approximately 24% of the Condo Association votes. *See* Condo Decl. ¶ 10. This approximately three-to-one advantage over Plaintiffs, coupled with the N-Y Brothers' complete identity of interests (as well as complete identify of interests with the interests of the various N-Y Entities), renders Plaintiffs' efforts meaningless because there is no scenario in which the N-Y Brothers control less than a supermajority of Condo Association votes, rendering Plaintiffs marginalized and powerless to advance the Condo Association's interests.

147.    This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

148.    This portion of Plaintiffs' Verified Third Amended Complaint is supported by the Declaration of Orman Gaspar, under penalty of perjury, attached hereto and incorporated herein.

149.    Plaintiffs are entitled to an award of reasonable attorney fees upon prevailing on this derivative action.

150.    Plaintiffs' previously initiated litigation (including all iterations of their federal complaint thus far filed, as well as communications between counsel for the parties have constituted sufficient pre-suit demand to give the N-Y Brothers ample time and opportunity to exercise their reasonable business judgment to advance and protect the Condo Association's best interests in the manner repeatedly articulated and sought by Plaintiffs since the litigation began.

151.    Additionally and/or alternatively, to the extent, if any, the Court deems Plaintiffs' foregoing efforts to fall short of the notice requirements under the law, Plaintiffs assert that such demand is excused because demand would be futile given that, as described above, the N-Y Brothers possess a supermajority of votes on the Condo

Board and the Condo Association, by which they have unfettered power to neglect the Condo Association's interests in favor of their own, thereby breaching their fiduciary duties to the Association. At bottom, it is presumptively unlikely that the N-Y Brothers would respond fairly to a demand for action by Plaintiffs on behalf of the Condo Association. As described above, there is no scenario in which the N-Y Brothers control less than a supermajority of Condo Association votes, rendering Plaintiffs powerless to advance the Condo Association's interests. As such, the N-Y Brothers have had unfettered power to breach their duties to the Condo Association as described herein, including their fiduciary duties of obedience, loyalty and due care.

152.    The duty of obedience required the N-Y Brothers to avoid committing *ultra vires* acts. The duty of loyalty required the N-Y Brothers to avoid conflicts and self-dealing at the expense of the Condo Association. And the duty of care required the N-Y Brothers to be diligent and prudent in managing the Condo Association's affairs.

153.    The N-Y Brothers have breached their fiduciary duties of obedience, loyalty and due care by engaging in various acts and/or omissions, including various *ultra vires* acts and/or omissions as described herein, in which they have enriched themselves at the expense of the Condo Association, including without limitation by failing to repair and maintain the Condo Building as a "Class A" office space that will command top market rental rates; having Texas Name Ltd. execute a contract with N.F. Mgt. for maintenance of the Condo Building when that power rested exclusively with the Condo Association; taking out an insurance policy on the entire building when they do not own the entire building and the insurance policy should have been held by the Condo Association; reappropriating and diverting the insurance proceeds from their intended use to repair the building; and representing to Plaintiffs that they would engage a "professional management company" and soliciting their written consent to do the same while instead creating their own management company that was not a professional management company and was run by employees with no experience in professional building management.

D.    **FOURTH CAUSE OF ACTION: CONVERSION (BY PLAINTIFFS INDIVIDUALLY, AGAINST TNMI, THE N-Y BROTHERS, AND DANIELA REYNOSO)**

154.    Plaintiffs hereby incorporate by reference paragraphs 1 through 111 of this Complaint as though restated fully here.

155.    Plaintiffs have an undivided ownership interest in and title to the General Common Elements of the Condo Building.

156.    Therefore, Plaintiffs have an undivided ownership interest in and title to personal property in the form of all income derived from the General Common Elements.

157.    Such income includes money in the form of settlement proceeds of the kind received by TNMI to settle its 2017 lawsuit against Cincinnati Insurance.

158.    The N-Y Brothers, TNMI, and Daniela Reynoso wrongfully and without Plaintiffs' authorization assumed dominion and control of Plaintiffs' undivided ownership interest in the monies paid by Cincinnati Insurance to TNMI pursuant to those parties' 2018 settlement agreement.

159.    That the N-Y Brothers, TNMI, and Daniela Reynoso perpetrated this scheme without informing Plaintiffs and continue to conceal it today manifests the N-Y Brothers, TNMI, and Daniela Reynoso's clear repudiation of Plaintiffs' rights. Accordingly, Plaintiffs are not required to demand return of the property in question. In addition, demand would be futile because, upon Plaintiffs' discovery of the conversion, the conversion had become complete. *See* McVea v. Verkins, 587 S.W.2d 526 (Tex. App.—Corpus Christi 1979, no writ). Moreover, a demand and refusal are not required where, as here, the possession was acquired wrongfully. *See id.* (citing *Hicks Rubber Co., Distributors v. Stacy*, 133 S.W.2d 249 (Tex. App.—Austin 1939, no writ)).

160.    The N-Y Brothers, TNMI, and Daniela Reynoso's scheme damaged Plaintiffs, *inter alia*, by depriving them of the benefit of the settlement and by increasing the deferred costs to repair and maintain the General Common Elements damaged by the 2016 storm that precipitated TNMI's 2017 suit against Cincinnati Insurance.

161.    Therefore, the N-Y Brothers, TNMI, and Daniela Reynoso are liable to

Plaintiffs for conversion.

162.    Furthermore, because Plaintiffs did not learn of this conversion until April 2023, this Cause of Action is timely under the delayed discovery rule.

**E.    FIFTH CAUSE OF ACTION: CIVIL CONSPIRACY (BY PLAINTIFFS INDIVIDUALLY, AGAINST THE N-Y BROTHERS, TNMI, AND DANIELA REYNOSO)**

163.    Plaintiffs hereby incorporate by reference paragraphs 1 through 111 of this Complaint as though restated fully here.

164.    Each of the N-Y Brothers, TNMI, and Daniela Reynoso combined and agreed to collude, and did collude to perpetrate the wrongdoing and effectuate the schemes described above, including conversion of Plaintiffs' undivided ownership interest in the monies paid by Cincinnati Insurance to TNMI pursuant to the above-described settlement agreement in 2018.

165.    As such, the object of the above combination was to accomplish an unlawful purpose or a lawful purpose by unlawful means. Indeed, there was a meeting of the minds on the object or course of action to perpetrate the wrongdoing and effectuate the unlawful schemes described above; and, in fact, at least one of the members of the combination did commit an unlawful, overt act to further the above-described object or course of action.

166.    The conspiracy between and among the N-Y Brothers, TNMI, and Daniela Reynoso to convert Plaintiffs' share of the insurance settlement proximately caused injury to Plaintiffs.

167.    Plaintiffs' injuries include, *inter alia*, costs of maintenance and repair and diminution in value of their interest in the Condo Building, as well as the deprivation of their personal property.

168.    Therefore, the N-Y Brothers, and TNMI and Daniela Reynoso are jointly and severally liable to Plaintiffs for civil conspiracy to commit, *inter alia*, the tort of conversion.

## VI.     REMEDIES

**A.     DAMAGES**

169.     Plaintiffs hereby incorporate by reference paragraphs 1 through 111 of this Complaint as though restated fully here.

170.     Plaintiffs seek all actual, special, incidental and consequential damages including the cost to restore the Condo Building to the condition at which it should have been maintained (which now exceeds $27,000,000).

171.     Additionally, if the N-Y Defendants are not compelled to make the necessary repairs and undertake the required maintenance to the Condo Building, Plaintiffs will further suffer from reduced or non-existent rental revenue because the Condo Building is no longer "Class A" office space commanding top market rental rates.

172.     Moreover, the reputation and marketability of the Condo Building in its current, dilapidated state, which is a result of the N-Y Defendants' above-described malfeasance, removes it from the consideration of commercial tenants looking to rent "Class A" commercial space in San Antonio, despite its convenient location adjacent to a freeway and near both the San Antonio International Airport and San Antonio's downtown business district.

173.     Because at least some of the N-Y Defendants have breached fiduciary duties owed to Plaintiffs as alleged herein, appropriate monetary damages and other appropriate remedies, include but are not limited to disgorgement of profits, forfeiture of contractual consideration paid to the N-Y Defendants, and the imposition of appropriate constructive trusts, as may be appropriate.

**B.     RESTITUTION**

174.     Plaintiffs hereby incorporate by reference paragraphs 1 through 111 of this Complaint as though restated fully here.

175.     Because the N-Y Brothers have breached their fiduciary duties, Plaintiffs seek restitution of all funds paid to the N-Y Brothers as fees for service, including to any N-Y Entity in which the N-Y Brothers have an interest.

## VII.    JOINT AND SEVERAL LIABILITY

176.    The N-Y Defendants are jointly and severally liable for each other's acts and omissions under the *alter ego* doctrine. However, in accord with the Court's Order of November 7, 2022, which dismissed certain of Plaintiffs' claims against N.F. Mgt. and TNMI,[17] Plaintiffs do not assert an *alter ego* theory of liability as between those two entities, directly.

177.    The N-Y Defendants and Daniela Reynoso are jointly and severally liable for each other's acts and omissions as coconspirators.

## VIII.    PREJUDGMENT AND POST-JUDGMENT INTEREST

178.    Plaintiffs seek pre-judgment and post-judgment interest at the maximum legal rate.

## IX.    COSTS

179.    Plaintiffs request that all costs associated with litigation be awarded to the prevailing party in this suit.

## X.    ATTORNEYS' FEES

180.    Pursuant to Section 38.001(b)(8) of the Texas Civil Practice and Remedies Code, and Section 19(c) of the Lease dated February 1, 1990, Plaintiffs request reasonable attorney fees be awarded to the prevailing party. Moreover, Plaintiffs request reasonable attorney fees be awarded if they prevail on their derivative action brought against the N-Y Brothers on behalf of the Condo Association.

## XI.    CONDITIONS PRECEDENT

181.    All conditions precedent to Plaintiffs' right to recover and Defendants' liability have been performed, have occurred, or have been waived.

## XII.    ALTERNATIVE PLEADINGS

182.    The foregoing facts and theories are pled cumulatively and alternatively,

---

[17] *See supra* note 1.

with no election or waiver whatsoever of rights or remedies.

## XIII.   <u>JURY DEMAND</u>

183.    Plaintiffs have requested a trial by jury and have tendered the requisite fee.

## XIV.   <u>PRAYER</u>

184.    Plaintiffs ask the Court to order Defendants to appear and answer and to order the remedies identified above, according to proof, together with prejudgment interest, post-judgment interest, costs of suit, attorney fees, and such other relief as the Court deems proper.

Respectfully submitted,


/s/ *Francisco Guerra IV*
Francisco Guerra IV
(Tex. Bar No. 00796684)
fguerra@wattsguerra.com
Edward W. Allred
(Tex. Bar No. 50511764)
eallred@wattsguerra.com
Lance P. Kimbro
(Tex. Bar No. 24124779)
lkimbro@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Dr.
Bldg. 3, Ste. 100
San Antonio, TX 78257
(210) 447-0500 t
(210) 447-0501 f

*Counsel for Plaintiffs*

## DECLARATION UNDER PENALTY OF PERJURY

I, ORMAN GASPAR, a citizen of the United States and a resident of the State of California, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have reviewed Part V.C of Plaintiffs' Verified Third Amended Complaint—entitled "THIRD CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY (ON BEHALF OF THE CONDO ASSOCIATION, AGAINST THE N-Y BROTHERS)"—and that it is true and correct to the best of my knowledge except where expressly and specifically based upon information and belief.

ORMAN GASPAR
*L.B. Benon Family Limited Partnership*
*Benon Marital Trust*
*Hasson Family Trust*
*Greens Family Limited Partnership*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record are being served with a copy of this document in accordance with the Federal Rules of Civil Procedure via the Court's CM/ECF system on July 5, 2023.


/s/ *Francisco Guerra IV*
Francisco Guerra IV